IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff, | § | |
| v. | § | 6:15-CV-364-RP |
| $48,880, MORE OR LESS, IN UNITED STATES CURRENCY, | § | |
| Defendant, | § | |
| EPHRAIN JOSEPH, | § | |
| Claimant. | § | |

## ORDER

Before the Court is the motion for summary judgment, (Dkt. 26),[1] filed by Petitioner United States of America ("the Government"). After reviewing the briefing, facts, and relevant law, the Court finds that the motion should be **GRANTED**.

## I. BACKGROUND

The Government brings this motion for summary judgment, seeking an order from the Court securing the forfeiture of the U.S. currency at issue in this proceeding. The $48,880 in question was seized on June 23, 2015, by the United States Postal Inspection Service ("USPIS") pursuant to an investigation into the suspected transportation of drugs and money by mail. (Compl., Dkt. 1, ¶ 5). The money was found in a package sent through the mail, with the sender on the label identified as the claimant in this case, Ephrain Joseph ("Joseph"). (*Id.* ¶ 11). After the package was

---

[1] The motion is ostensibly 13 pages long. However, it is accompanied by a 13-page appendix entitled "Undisputed Facts." (*See* Mot. Summ. J., Dkt 26, at 3 ("III. UNDISPUTED FACTS: See Appendix (App'x)"); Appendix, Dkt. 26-1, at 1–13)). The Local Rules of the Western District of Texas dictate that the page limit for dispositive motions is 20 pages. W.D. Tex. Loc. R. CV-7-(d)(3) ("Unless otherwise authorized by the court, a dispositive motion is limited to 20 pages."). The Government filed a motion for summary judgment that was 26 pages long. The Government never received authorization from the Court to do so. When a party feels it necessary to file a brief that exceeds 20 pages, the party should request permission from the Court.

singled out by Rokky, a dog trained in drug detection, on June 17, 2015, the USPIS obtained a warrant and opened the package on June 23, 2015. (*Id.* ¶¶ 12, 16). Once opened, USPIS investigators discovered that the package contained $48,880 in U.S. currency. (*Id.* ¶ 16). When asked why he was sending nearly $50,000 in cash through the mail, Joseph told investigators that the money was for a down payment on a house in Lebanon, Oregon, the destination of the seized package. (*Id.* ¶ 14). The USPIS notified Joseph of the seizure of the property on August 12, 2015; he submitted a claim contesting administrative forfeiture on September 14, 2015. (*Id.* ¶ 28). The Government brought an action to forfeit the property pursuant to 18 U.S.C. § 981(a)(1) and 21 U.S.C. § 881(a)(6) in this Court on December 11, 2015. (Dkt. 1). The Government alleges that the property was "involved in, constitutes or is derived from proceeds traceable to the sale of narcotics and/or property used to facilitate unlawful drug crimes in knowing violation of 21 U.S.C. §§ 801, *et seq.* and 18 U.S.C. § 1957." (*Id.* ¶ 30). Joseph filed a belated answer on July 5, 2016, (Dkt. 8), which the Government moved to strike. (Dkt. 12). The Court denied the motion, (Dkt. 22), leaving the answer in place. The Court subsequently sanctioned Joseph for failing to appear at his deposition. (Dkt. 27). To this date, as far as the Court is aware, Joseph has not paid the amount owed pursuant to the sanction. The Government moved for summary judgment on July 28, 2017. (Dkt. 26). Joseph did not respond to the motion.[2] On September 11, 2017, he filed a document with the Court purporting to be a house listing in Lebanon, Oregon, accompanied only with the explanation that he was submitting the document as "verification [that a] home was for sale." (Dkt. 32).

## II. LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[2] Joseph's failure to respond to the motion or otherwise raise the "innocent owner" defense forecloses that defense. *See* 18 U.S.C. § 983(d)(1) ("An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute. The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence."). Because Joseph has not raised the defense, he has not met his burden.

56(a). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party bears the burden of proof at trial, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991) (quotation marks and citation omitted). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986). "After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). The parties may satisfy their respective burdens with depositions, affidavits, and other competent evidence. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The Court will construe "all facts and inferences in the light most favorable to the nonmoving party," *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012).

### III. THE GOVERNMENT'S EVIDENCE

Pursuant to 18 U.S.C. § 983(c)(1), in a civil forfeiture action "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." To prevail on its claim that the property at issue in this case is subject to forfeiture because it was "involved in the commission of a criminal offense," the Government must show "that there was a substantial connection between the property and the offense." 18 U.S.C.

3

§ 983(c)(3).[3] The Fifth Circuit has made clear that the changes to the forfeiture procedure brought about by CAFRA, namely, changing the burden on the Government from "probable cause" to "substantial connection" no longer permit the introduction of hearsay to support a showing of substantial connection. *United States v. $92,203 in U.S. Currency*, 537 F.3d 504, 510 (5th Cir. 2008) ("[B]y enacting CAFRA, Congress intended to end the practice of reliance on hearsay in civil forfeiture decisions.").

To support its motion for summary judgment, the Government argues that the evidence it has produced "establishes that the Defendant Property constitutes money furnished or intended to be furnished in exchange for marijuana, proceeds traceable to such an exchange, or money used or intended to be used to facilitate a violation of the Controlled Substances Act." (Mot. Summ. J., Dkt. 26, at 5). The Government maintains that it has met its burden by showing: (1) the possession of a large amount of cash; (2) a positive alert by a drug-sniffing dog; (3) the suspicious circumstances of the mailing; (4) Joseph's lack of income or employment in 2015; (5) evidence that Joseph sold marijuana; (6) Joseph's nervous demeanor and inconsistent statements; (7) Joseph's failure to respond to the Government's requests for admissions; and (8) the lack of a legitimate explanation for the origin of the money seized. (*Id.* at 6–11).

The Government has met its burden. When taken together, the large amount of cash sent in the mail, the lack of a plausible legitimate explanation for sending the money, the evidence that Joseph had packages delivered to various houses in his area addressed to fictitious people, the evidence that Joseph sold marijuana, and the evidence that some of the people who received

---

[3] As the Government notes in its brief, the Government now has "the burden of establishing by a preponderance of the evidence that a substantial connection exists between the property to be forfeited and the criminal offense." (*Id.* at 4 (citing *United States v. $92,203 in U.S. Currency*, 537 F.3d 504, 508–09 (5th Cir. 2008))). The standard prior to 2000 was different: the Government needed only show probable cause. *United States v. One 1987 Mercedes*, 919 F.2d 327, 331 (5th Cir. 1990) ("Rather, it is the totality of the circumstances . . . that leads to a finding of probable cause."). The change came with the passage of the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Pub. L. No. 106–185, 114 Stat. 202. *See $92,203*, 537 F.3d at 507–08.

4

packages for Joseph did so in exchange for marijuana, add up to show by a preponderance of the evidence that the money seized here was illicit.

*A. Possession of Large Amount of Cash*

The Government first contends that the amount of cash that Joseph attempted to mail is itself strong evidence that the cash is connected with drug activity. (*Id.* at 6 (citing *United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 468 (7th Cir. 2005))). The Government argues that, in addition to the quantity of cash itself, the denominations and organization of the cash—small dollar amounts bundled with rubber bands—make it more likely than not that it was linked to the drug trade. (*Id.*). All of these factors have been found probative by federal courts. *See United States v. Three Hundred Sixty-Nine Thousand Nine Hundred Eighty Dollars in U.S. Currency*, 214 F. App'x 432, 434 (5th Cir. 2007) (upholding a jury's finding of forfeiture and approving the "quantity of currency" and the "method of packaging" as factors weighing in favor of the jury's finding); *United States v. $252,300 in U.S. Currency*, 484 F.3d 1271, 1274–75 (10th Cir. 2007) (finding a large amount of currency bundled in stacks by rubber bands and wrapped in cellophane to be a fact that "must be given significant probative value"). While the possession of a large amount of cash, in itself, is not sufficient to establish by a preponderance of the evidence that money is used in connection with drug activity, it is properly considered as a factor in the inquiry. *$252,300*, 484 F.3d at 1275 ("A large amount of currency, while not alone sufficient to establish a connection to a drug transaction, is 'strong evidence' of such a connection.") (quoting *United States v. $149,442.43 in U.S. Currency*, 965 F.2d 868, 877 (10th Cir. 1992)).

Here, the Government has shown through the declaration of William B. Witt, a USPIS investigator who was involved in opening the package, that the currency totaled $48,880, was bundled in rubber-banded stacks, and primarily consisted of bills of $20, $10, and $5. (Witt Decl.,

Dkt. 26-7, ¶ 18). This evidence weighs in favor of the Government's position that the money was connected to drug activity.

*B. Receiving Suspicious Packages with Fake Names on Address Label*

The Government has provided deposition testimony of multiple people who say that Joseph had packages shipped to their houses with fictitious names, sometimes in exchange for marijuana. Susan Dennison received packages for Joseph at her house, (Dennison Dep., Dkt. 26-3, at 17:7–9), and in return he would give her marijuana, (*id.* at 19:23–20:2). The packages sent to Dennison's house contained a fictitious recipient's name: Carol Wheatley. (*Id.* at 23:16–22). No one by that name lived at Dennison's address. (*Id.* at 23:18–22). Andre Stinson also received packages from Oregon on behalf of Joseph, once in exchange for marijuana, (Stinson Dep., Dkt. 26-6, at 25:13–20), but when Stinson realized that Joseph had continued to have boxes delivered to Stinson's address without Stinson's knowledge, Stinson confronted Joseph and told him to stop, (*id.* at 27:7–14). The packages sent to Stinson were addressed to an Evelyn Roberts; no one by that name lived at Stinson's address. (*Id.* at 30:9–22). When taken together, without explanation from Joseph, these circumstances give rise to the inference that the money seized here was connected to the drug trade.

*C. Marijuana Dealing*

The Government has provided deposition testimony of two people who say that Joseph supplied them with marijuana regularly in the months leading up to the seizure of the package in July of 2015. (Dennison Dep., Dkt. 26-3, at 12:25–13:17, 14:13–21 (received roughly a quarter ounce of marijuana from Joseph about once every ten days from the fall of 2014 to June 2015); Stinson Dep., Dkt. 26-6, at 20:2–4, 21:8–14, 22:25–23:7 (received an eighth or a quarter of an ounce of marijuana from Joseph every week or two from December 2014 to summer of 2015)). This evidence tends to make it more likely than not that the money seized in the package was the proceeds of or connected with selling drugs.

*D. Conflicting Statements*

When questioned separately on June 17, 2015, Joseph and his girlfriend at the time provided inconsistent accounts of several pertinent matters they were questioned about. His girlfriend stated she had not been able to reach Joseph that day, that she had no knowledge of the package, and that she did not know Luke Welch, the addressee of the package. (Witt Decl., Dkt. 26-7, ¶ 15). Joseph said that he did mail the parcel, that he had known Luke Welch for several years after his girlfriend had introduced him to Welch while visiting Oregon, and that he had spoken with her several times that morning. (*Id.* ¶ 16). He said that the money was for a down payment on a house, but he could not provide further details, such as price or location. (*Id.*). He also said that he had not mailed similar packages in the past, (*id.*), which was inconsistent with Witt's review of post office records, which revealed that Joseph had sent 15 packages to Joseph Welch at the same Lebanon, Oregon address between January and May of 2015, (*id.* ¶ 10). "All of these inconsistencies are relevant in weighing whether the government has established its burden justifying forfeiture." *United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 467 (7th Cir. 2005).

*E. Rokky's Alert*

The Government contends that Rokky's alert to the package is also probative. The extent to which a drug dog's alert to currency demonstrates that the currency is the proceeds of a drug transaction is the source of some debate between federal courts. *See, e.g.*, *Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d at 455–62 (overviewing the extensive literature on the reliability of dog drug detection on currency); *United States v. $58,920 in U.S. Currency*, 385 F. Supp. 2d 144, 153 (D.P.R. 2005) ("In fact, it has been demonstrated that as much as 70-80% of money in circulation may carry the residue of narcotics."); *United States v. $12,840 in United States Currency*, 510 F. Supp. 2d 167, 172 (D. Mass. 2007) ("[T]he only evidence connecting the cash in this case to a drug transaction is the barking of a dog which is, at best, of limited value."); *United States v. Ten Thousand Seven Hundred*

7

*Dollars in U.S. Currency*, 258 F.3d 215, 230 (3d Cir. 2001) (noting that "several of our sister circuits recently have called into question the evidentiary significance of a positive reaction to currency in determining whether there is probable cause to forfeit the money in light of studies indicating that a large percentage of United States currency is contaminated with sufficient traces of drug residue to cause a canine to 'alert' to it"). A drug dog alert has been recognized by the Fifth Circuit as a factor that can be probative. *$369,980*, 214 Fed. App'x at 434 (counting "the drug dog alert" as among the evidence the court found, as a whole, was "sufficient evidence to support the jury verdict of forfeiture). While as a single factor a drug dog alert would likely be insufficient to meet the Government's burden, it can be granted probative value when considered with other factors. *See, e.g.*, *United States v. $15,795 in United States Currency*, 197 F. Supp. 3d 827, 835 (M.D.N.C. 2016) (finding a dog sniff sufficiently probative to meet the substantial connection standard when combined with a history of the claimant violating the Controlled Substances Act and the claimant's "knowingly false statements to [the investigator] about the source of and his intentions with the currency").

Here, both Rokky and his human investigative partner, Gabrielle Guerra, had undergone significant training in drug detection. Rokky was certified in the odor recognition of cocaine, ecstasy, heroin, marijuana, and methamphetamine by the National Narcotic Detector Dog Association (NNDDA) on April 23, 2009. (Guerra Decl., Dkt. 26-4, ¶ 3). Rokky was recertified by the NNDDA each year until his retirement in December 2016. (*Id.*). Guerra received 1,040 hours of training in various canine techniques from 2002 to 2004. (*Id.* ¶ 2). On June 17, 2015, Guerra and Rokky arrived at the Harker Heights Police Department (HHPD) training conference room, where there were four boxes along the wall. (*Id.* ¶¶ 5–6). The other three boxes contained nothing. (Witt Decl., Dkt. 26-7, ¶ 14). Rokky alerted to the parcel containing the money, but he did not alert to any of the other parcels. (Guerra Decl., Dkt. 26-4, ¶ 7). Under these circumstances, when considered along with the other considerable evidence amassed by the Government, the dog's alert to the currency "provides

8

some—albeit slight—indication that [the] money was connected to drug trafficking." *United States v. $84,615*, 379 F.3d 496, 502 (8th Cir. 2004).

*F. Evidence Not Found Probative*

Some of the evidence put forward by the Government is not probative, including the circumstances deemed suspicious by the Government surrounding the package's labeling and addressing and Joseph's alleged lack of legitimate income. Nonetheless, the evidence summarized above is sufficient for the Government to meet its burden.

### 1. "Suspicious" Circumstances

The Government contends that the circumstances surrounding the package's mailing also give rise to the conclusion that the money was connected with illicit narcotics activity. Some of the activities the Government deems "suspicious" are perfectly consistent with normal behavior. For example, the Government would have the Court believe that the "use of a handwritten mailing label" and the fact that the "ZIP Code from where the Parcel was mailed was different than the ZIP Code used in the return address" indicate "a connection to the drug trade." (Mot. Summ. J., Dkt. 26, at 7). This is a stretch. Unsurprisingly, the Government provides no case law to support the contention that these actions are inherently suspect, since this argument defies common experience—hand-writing a label is equally consistent with sending a birthday present to a family member; mailing a package from a different ZIP code than that listed on the return address could be a result of, say, mailing a package after work at a post office near the office. The Court does not credit these circumstances as probative.

### 2. Joseph's Alleged Lack of Legitimate Income

The Government further suggests that Joseph's lack of reported income or legitimate employment also tends to show that the cash seized was drug proceeds, but the Government has failed to produce sufficient evidence to support this assertion. The lack of legitimate income is

9

generally considered a factor probative of the illicit source of property. *See $369,980*, 214 F. App'x at 434 (affirming the lack of income of the claimant as a reason to uphold the jury verdict in favor of forfeiture); *United States v. Betancourt*, 422 F.3d 240, 252 (5th Cir. 2005) (upholding the jury's determination in a criminal forfeiture proceeding that the funds used to purchase a winning lottery ticket came from drug sale proceeds on the basis that there was evidence that the defendant had no other source of income); *see also United States v. Assorted Jewelry Approximately Valued of $44,328.00*, 833 F.3d 13, 17 (1st Cir. 2016) ("[W]e would likely have been persuaded of a substantial link between the jewelry and drug activity if the record bore out the government's additional claim that [the claimant] lacked the means to purchase the jewelry with legal income because, aside from drug dealing, he had only limited, part-time work.") (citing *United States v. 6 Fox St.*, 480 F.3d 38, 43–44 (1st Cir. 2007)). While the lack of legitimate income is likely not enough, by itself, for the Government to meet its burden, *see, e.g.*, *United States v. 90-23 201st St.*, 775 F. Supp. 2d 545, 565 (E.D.N.Y. 2011) ("[S]tanding alone, the questions raised by [the claimant's] unexplained income are insufficient to establish, as a matter of law, the requisite substantial connection by a preponderance of the evidence."), it can be probative when combined with other factors.

Here, Joseph concedes that Texas Workforce Commission records show no reported income earning for 2014 and 2015 for him. (Answer, Dkt. 8, ¶ 18). However, the Government does not explain why the Texas Workforce Commission should have records of Joseph's income or why the fact that the Commission does not have such records necessarily means that he was not legitimately employed, so the Court does not credit this fact as probative. The Witt Declaration states that Witt "determined that Joseph had no reported earnings for the years of 2014 and 2015," but it does not say how. (Witt Decl., Dkt. 26-7, ¶ 20). Joseph's wife, Erin Joseph, testified in her deposition that Joseph was not employed after his contractor job was over, but she does not say when that was, or whether it was after the period in question. (Erin Joseph Dep., Dkt. 26-5, at 28:1–

14). Although the lack of legitimate income can be a factor weighing in the Government's favor, the Government has not produced sufficient evidence to suggest that Joseph had no legitimate income at the time.

## IV. THE CLAIMAINT'S EVIDENCE

The only response Joseph has filed since the Government moved for summary judgment was an advisory to the Court, which includes a listing for a house in Lebanon, Oregon that—according to the listing—was sold on August 9, 2017, with the accompanying one-sentence explanation: "Plaintiff [sic] hereby submits verification home was for sale." (Dkt. 32). In doing so, Joseph appears to suggest that the house listed in the attached document was the house to which he had been referring when he initially told federal investigators that the money seized was a down payment for a house. As the Government pointed out, the response was untimely, and even if it had been timely, it does not help Joseph's case. The fact that a house was sold in Lebanon, Oregon in August 2017 does not make Joseph's explanation for the cash payment—that the money he had mailed without any accompanying explanation that was seized in 2015 was a down payment for a house—any more plausible. Joseph has not claimed that he owns the house listed in the document or established any other sort of connection between the cash seized in the mail and the house that he says was sold in Lebanon, Oregon in August 2017.

## V. CONCLUSION

The Government has produced sufficient evidence to demonstrate by a preponderance of the evidence that it is entitled to forfeit the money. The evidence it has pointed to suggests that the most plausible explanation for Joseph's sending nearly $50,000 in cash in the mail is that he was paying the money in exchange for drugs, which he likely received by having them delivered to the addresses of various people in his area. This is far more likely than the explanation that Joseph has provided—that the money was a down payment for a house. He has not explained why the money

was unaccompanied by any sort of correspondence regarding a down payment, where the house he claims to have purchased is located, or how much it cost; he has not produced evidence that he owns the house; he has not explained why he paid for the house in cash; and he did not show up at his own deposition or file a response to the Government's motion for summary judgment, so the Court has no way of knowing any further such explanations he may have. This failure to explain the cash, when combined with the evidence produced by the Government—that Joseph sold marijuana, persuaded others to receive packages on his behalf in the mail (usually addressed to fictitious people and sometimes for which Joseph would give the recipient marijuana in exchange), and provided inconsistent statements to the investigator—is sufficient to show by a preponderance of the evidence that the cash is subject to forfeiture. Joseph has not introduced any evidence to raise a genuine issue of material fact as to whether the money is subject to forfeiture. Therefore, the Government's motion for summary judgment, (Dkt. 26), is **GRANTED**.

    **SIGNED** on March 20, 2018.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE